UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X

CONSOLIDATED PRECISION PRODUCTS CORP.,

      Plaintiff,

- against -

GENERAL ELECTRIC COMPANY,

      Defendant.

------------------------------X

Civil Action No.

**Plaintiff Demands Trial by Jury**

## ORIGINAL COMPLAINT

Plaintiff, Consolidated Precision Products Corp. ("CPP"), by and through its attorneys, Rose Walker, LLP and Farrell Fritz, P.C., alleges as its complaint against General Electric Company ("GE") the following:

## PARTIES

1. Consolidated Precision Products Corp. ("CPP") is a corporation organized under the laws of the State of Delaware with its principal place of business at 1621 Euclid Avenue, Suite 1850, Cleveland, Ohio 44115. CPP acquired ESCO Turbine Technologies – Mexico, Inc. ("ESCO") on or about November 7, 2012. As such, CPP is the successor in interest to ESCO's Master Supply Agreements (Exhibit 1) and (Exhibit 2).

2. Defendant General Electric Company ("GE") is a corporation organized the Laws of the State of New York with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut. The claims and dispute in this case arise through the manufacturing activities of a GE division, General Electric Transportation Systems ("GET").

## JURISDICTION AND VENUE

3. The Court has diversity jurisdiction because the parties are completely diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs. 28 U.S.C. 1332.

4. The Court has both specific and general personal jurisdiction over GE. GE is a resident of the State of New York and irrevocably consented to jurisdiction in the courts of the State of New York. (Exhibit 1 at ¶ 17).

5. Venue is proper because GE is a resident of the Southern District of New York and irrevocably consented to venue in the courts of the State of New York. *See* 28 U.S.C. § 1391, (Exhibit 1 at ¶ 17).

## BACKGROUND

6. GET manufactures huge diesel engines to power locomotives. The engines are turbocharged to provide power and performance. Turbocharging an engine involves funneling exhaust gases from the engine through a turbocharger fan assembly. The exhaust gases power high-speed turbines that, in turn, compress incoming fresh air which is then injected into the engine to increase performance. Turbochargers typically operate at speeds in excess of 40,000 RPM.

7. CPP (and its predecessor in interest, ESCO) is a casting manufacturer. CPP/ESCO specializes in manufacturing cast components for various transportation industries from aerospace to locomotives to stationary machinery. CPP does not design products, but simply builds to print various component parts based on customer design and manufacturing specifications.

8. The components at issue in this case are turbocharger blades originally manufactured by ESCO, and later CPP, for use in GET's train engines. GET and ESCO entered into five year Master Supply Agreements ("MSA") on two occasions: May 1, 2006, (Exhibit 1) and January 1, 2012, (Exhibit 2). These Master Supply Agreements governed the relationship of the parties. Specific purchase of turbocharger blades was accomplished by individual purchase

2

orders. These purchase orders contained boiler plate basic terms and conditions also called Standard Terms and Conditions (T&Cs). In all cases, the T&Cs applied to the individual purchase orders and, in every event, were not applicable to the extent they were inconsistent or conflicted with the terms of the Master Supply Agreements. On November 6, 2012, CPP acquired ESCO Turbine Technologies, including its operations identified as ESCO Turbine Technologies – Mexico, Inc. and became the successor in interest to the Master Supply Agreements.

9. In manufacturing blades, whether they be for an aircraft engine or a diesel locomotive turbocharger, quality and cost are closely related to the type of metal specified, the type of processing utilized, and most importantly, the stringency of inspection and finishing. The cost to produce a blade under the simplest standards can be three or four hundred percent less than the cost to manufacture the identical blade under more exacting aerospace standards. Here, GET delivered a one-page blueprint with basic detail and quality specifications.

10. An additional example of GET's focus is its decision to not serialize individual blades as cast so that their quality control could be accurately tracked. Manufacturers of precision turbine blades like those used in aviation applications routinely call for blades to be serialized. (GE does this with its Aerospace quality castings.) Instead, GET simply required a group of blades to be identified by batch number and those batches identified on delivery under purchase orders.

11. Importantly, GET also specified that the grinding processes were to be performed by an outside vendor, Benchmark. The 1-page specification originally delivered by GET to ESCO contained references to two manufacturing standards: (1) a one-page Dovetail Grinding Process Specification identified as 41A221075 (hereinafter the "Walbar Specification); and (2) a

source substantiation specification identified as 41A219577.  The Dovetail Grinding Process Specification applied only to GET's chosen grinding operation shop, Benchmark, which was the specified grinding shop for the life of the contract relationship between GET and ESCO/CPP.  In January 2010, GET changed its manufacturing specification callout for these blades by delivering a new 1-page blueprint to ESCO.  That blueprint <u>deleted</u> the Walbar Dovetail Grinding Process (41A221075)  All of the blades manufactured by ESCO and CPP that are the subject of this dispute were manufactured under the one-page blueprint specification that contained no <u>grinding</u> <u>specification</u>.

Relevant Contract Terms and Provisions

12. As noted above, a material purpose of GET's Master Supply Agreements was to control cost and hence price to be paid for these high volume, mass produced turbocharger blades.  For example, see paragraph 3.2 of the Master Supply Agreement (Exhibit 2).  The Master Supply Agreement, therefore, is a classic commercial contract which fully negotiated price and quality, and which carefully allocated the risk of loss between the parties.

13. The careful allocation of risk is evident in the warranty provisions of both Master Supply Agreements. For instance, both agreements contain Express Disclaimer of Warranties, Exhibits 1 and 2.  Under paragraph 7.2 of both agreements, the following disclaimer appears: "**this Warranty is exclusive and ESCO makes no warranty of merchantability or fitness for particular purpose or any other warranties, express or implied."**  (emphasis in original). The <u>only</u> limited warranty under the Master Supply Agreements is contained in paragraph 7.1, which provides:

> 1. A warranty that "at the time of delivery, Products supplied to GE will conform to the applicable written specifications, drawings or designs supplied by GE and accepted by ESCO (within the tolerances designated in writing by GE, **or if not designated, then as reasonably determined by ESCO**)," (emphasis added); and

2. A warranty that the products "will be free from defects in material and workmanship for a period of one year from the date of delivery."

*See* MSA at ¶ 7.1.  These are the only warranties at issue.

14. The MSAs also specifically limited GET's available remedies.  The MSA provides that "If products do not conform to GET' requirements as specified above, ESCO will promptly repair or replace the non-conforming Products."  See MSA at ¶ 7.1.  While this provision is not expressly identified as an exclusive remedy, the MSA also provides:

> ESCO's total responsibility to GE *arising from or relating to this Agreement*, beyond its obligation to repair or replace Product pursuant to Section 7.1 above, shall not exceed the greater of $5,000 per event or, in the aggregate, $25,000 in any calendar year.  Except as specifically stated in the preceding sentence, *notwithstanding anything in this Agreement or elsewhere to the contrary, ESCO shall not be liable for* (nor shall GE be entitled to) (a) any indirect, special, incidental, contingent, or consequential damages (including without limitation lost profits or lost savings) whether based on contract, tort or any legal theory, unless GE incurs such liability with it customers and such liability results directly from ESCO's failure to perform its obligations hereunder . . . .

*See* MSA at ¶ 8.3 (emphasis added).

15. CPP's liability is, therefore, limited to repair and replacement of defective blades and, at most, $25,000 per calendar year.  CPP is not liable for any indirect or consequential damages (such as costs of inspection) unless GE is liable to one of its customers for such damages.  Even if that were to occur, which has not in this case, CPP's liability for incidental and consequential damages is capped at the lesser of $750,000 or 16% of the total invoiced value of products in the calendar year in which liability is incurred.

16. Section 7.4 of the Master Supply Agreements further required GET to promptly reject in writing any nonconforming products and identify nonconforming defects with particularity.  Failure to do so results in waiver of the claims.

Recent History Between CPP and GET

17. Throughout the history of ESCO's, and later CPP's, relationship with GET related to these locomotive turbocharger blades, cost has been a key focus. Again, GET delivered a 1-page blueprint that governs all turbochargers produced by ESCO/CPP relevant to this suit. As will be seen, that emphasis changed in 2013 when GET, for the first time, began to specify aerospace-type quality for the manufacture of turbocharger blades. With that new specification came dramatic increases in complexity and, of course, cost. (None of the blades at issue were manufactured under the new specifications.)

18. In 2013, GET began to reevaluate its manufacturing and production specifications in an effort to improve reliability of their turbocharger blades/buckets. GET ran experiments testing differing quality control and manufacturing techniques. GET enlisted CPP's aide in performing these tests under projects that were broadly identified as "containment" and/or "DOE projects". As a result of this work, and in close conjunction with its aerospace turbine engine manufacturing unit, GET released an entirely new grinding specification in August 2013 entitled "Super Alloy Machining Specification No. 84A234483". This highly detailed specification was over 22 pages in length and was the first time that GET specified to its casting house and its grinding vendor detailed criteria for manufacturing "quality control and engineering". That Super Alloy Machining specification has since been revised by GET four additional times.

19. On information and belief, CPP alleges that GET, for commercial and customer relations issues, made a corporate decision to substantially upgrade the quality of their locomotive turbocharger blades. This change was made in concert with changes in operating and warranty agreements with its worldwide locomotive customers. The Super Alloy Machining Specification referenced herein was but one example of the changes instituted.

20.     Benchmark, as noted, is the actual company that performs the grinding operations that GET now complains were non-complaint.  In late 2014, GET first notified CPP that it believed Benchmark was not following its 1-page Walbar grinding specification - 41A219577– because Benchmark had changed the grinding wheel manufacturing source.  At that point CPP informed GET that the specification had been **removed** by GET from the manufacturing blueprint in January of 2010.  GET disagreed, and made a claim for several million dollars for delivery of non-compliant blades because they had not been ground using the specified grinding wheel.  Months later, GET began to describe Benchmark's practices differently, first claiming that Benchmark had made two undisclosed changes in its grinding operations.  When CPP demonstrated to GET that the Walbar specification was withdrawn by GET and thus, there would be no change in specification to report to GET, GET again changed its claim.  GET now claims that Benchmark's practices constituted abusive practice by industry standards and that somehow, in some way, CPP was responsible for those "abusive" practices.  Not only is CPP not responsible for Benchmark's practices, they are not abusive and in fact have been closely monitored and audited by GET for decades.

21.     CPP is also informed and believes and based thereon alleges that GET's claim regarding changes in grinding practice is a fictional event.  Specifically, GET engineers claimed to have "viewed" a CNC router change history at the Benchmark operation that changed the process for grinding the dovetail roots of these blades in January 2011.  Despite allegedly discovering this change in 2013, GET did not advise CPP of it, GET did not obtain a copy of it, cannot provide a copy of it, and, in fact, has admitted that no copy exists today.  On information and belief, CPP believes this story was fabricated by engineers to cover for their mistaken contention that the original grinding specification applied.

22. CPP voluntarily conducted tests and experiments requested by GET purportedly to enable GET to specify new aerospace standards at the onset of negotiations over a new Master Supply Agreement between the parties. CPP extended large amounts of material and labor, and otherwise diverted resources in pursuit of this effort. Accordingly, CPP seeks damages for those unnecessary costs and expenses.

23. CPP is informed and believes and thereon alleges that GET undertook a voluntary "recall" of over 650,000 turbocharger blades or buckets. This "recall" was undertaken by GET without the prior knowledge or consent of CPP. It was undertaken not because the blades were nonconforming, but because of GET's underlying business strategy.

24. CPP is informed and believes and thereon alleges that an additional motive for GET's recall and allegations of substandard workmanship was to effectuate more favorable contractual terms upon renegotiation between the parties. CPP granted concessions to GET in an effort to maintain a claimed "strained business relationship" as a result of these manufacturing quality control issues; issues that in fact never existed. GET's actions were designed to put pressure on a vendor.

25. GET has most recently made new and unsubstantiated claims about other manufacturing process defects it says might be in some or all of the blades produced under contract. They have referenced claims that some of the metallurgy in the blades exhibit evidence of "recrystallization". However, there is no "recrystallization" specification or standard in the blueprint. Indeed, recrystallization could not be determined in any blade by following the inspection criteria mandated by GET in its one-page blue print specification.

Arbitration Proceeding

26.     On September 14, 2015, GET purportedly submitted a demand for arbitration with the American Arbitration Association, a copy of which is attached hereto as (Exhibit 3). GET, however, failed to pay the required filing fee until many weeks later. The arbitration proceeding was not filed until this fee was paid.

27.     GET argued that the AAA has jurisdiction under § 3 of the Terms and Conditions. GET's reliance on this provision is curious given that its own attorneys, in response to CPPs request to mediate under the same Terms and Conditions, stated:

> GE is amenable to attempting to mediate the parties' dispute arising out of the failure of turbine buckets manufactured by CPP pursuant to the Contract, but its willingness to do so shall not constitute an acknowledgement or agreement that Paragraph 3(b) of the Terms and Conditions is binding or otherwise enforceable here. <u>Section 17 of the Supply Agreements supersedes the dispute resolution procedures in Paragraph 3(b) of the Terms and Conditions and the submission to jurisdiction and venue clause in Section 17 applies bilaterally under governing New York law.</u> GE's agreement to mediate is being made voluntarily and not as a result of Paragraph 3(b) of the Terms and Conditions, and is subject to the selection of a mutually agreed upon mediator and time, date, and location for the mediation. (emphasis added).

See (Exhibit 4). GET's own attorney, therefore, agrees that this Court is the proper venue for resolving this dispute. Moreover, the filing was defective because GET did not pay the filing fee until October 7, 2015.

28.     Nevertheless, GET claims in arbitration that over 600,000 blades manufactured at unidentified times from unidentified batch numbers and undisclosed purchase orders were "nonconforming" because, according to GET, Benchmark, the vendor specified by GET to perform the grinding operations, made minor alterations to the types of grinding wheels used and the way in which the grinding wheels were operated. Note that CPP does not perform any of the grinding operations. It simply delivers the as-cast blades to the mandated grinding operator, Benchmark, who grinds the blades per the same blueprint and then delivers them further along

9

the manufacturing process. GET claims that these changes were made without notification to GET by Benchmark. This claim fails for a variety of reasons, among them:

    a.    There was no grinding operation specification in effect at the time when the supposedly "nonconforming blades" were manufactured by CPP. In the absence of a specification calling out methods, there could be no specification from which a nonconforming departure would have been made.

    b.    GET in fact believed there was a grinding specification in place and under that misapprehension, first made the allegation in December 2014 that a departure had been made. GET's reliance on this nonconformity was misplaced and the claim was false.

    c.    GET failed to provide written notice to CPP and its predecessor in interest, ESCO, of any nonconformity and therefore waived those allegedly nonconforming parts.

    d.    Since there was no manufacturing grinding specification, it was impossible to depart from that specification and hence the goods delivered were conforming goods. CPP, therefore, complied with this warranty at the time of delivery.

29.    GET has conflated its allegation regarding tender of "nonconforming blades" with an allegation that such blades are also defective. In fact, there were no defective or "nonconforming" blades delivered by CPP and its predecessor in interest, ESCO.

30.    CPP alleges on information and belief that in fact all costs and expenses claimed by GET in its demand for arbitration arise under one of the following categories and are unrecoverable by GET:

    a.    Blade failures that occurred in service due to improper installation by GET;

b. Blade failures that were due to improper maintenance and operational misuse and abuse by GET's customers;

c. Blades that were prematurely removed from service without failure because of commercial considerations that benefited GET and were not the result of nonconforming blades; and

d. A commercial decision to unnecessarily replace blades in service to benefit GET.

31. GET's claim is based on a hyper technicality that is inconsistent with the agreement of the parties. Each of the blades delivered met all dimensional, material and property specifications called out on the one page blueprint. Yet GET seeks to declare over 640,000 such compliant blades as "non-conforming" because allegedly Benchmark and/or CPP failed to notify GET of minor changes in Benchmark's grinding processes. The argument fails for a variety of reasons and is an effort to obtain money damages not otherwise available under the contract.

   a. First, the blades meet all dimensional, material and property specifications and therefore are conforming blades.

   b. Second, there was no grinding specification that applied to Benchmark's operations and hence there could be no change in that grinding specification that required reporting.

   c. Third, since there was no written specification, the Master Supply Agreement, paragraph 7.1, designated CPP and ESCO as the parties who could and should determine what the reasonable tolerances were for grinding the blades. Specifically, section 7.1 provided "…at the time of delivery, products apply to GE will conform to the applicable written specifications, drawings or designs

supplied by GE and accepted by ESCO (within the tolerances designated in writing by GE, <u>or if not designated, then as reasonably determined by ESCO</u>)."

<u>GET Waived any Complaints Regarding Non-Conforming or Defective Blades</u>

32. Despite months of negotiations and filing an arbitration proceeding, GET still has not properly notified CPP of any alleged defect that could possible support its claim that more than 600,000 blades manufactured were nonconforming or defective.

33. GET was contractually required by the provisions of section 7.4 to promptly notify ESCO/CPP in writing of any defective blades and/or nonconforming product. GET claims that they discovered nonconforming processes and/or blades as early as 2013 and yet failed to provide notice. The failure to provide notice is not just a waiver under the contract, it is waiver by conduct. Moreover, GET's silence and repeated acceptance of conforming blades subsequent to the 2013 "discovery" resulted in CPP manufacturing hundreds of thousands of blades under circumstances demonstrating that GET was both increasing its supply of available blades and artificially increasing its "damages" for commercial reasons.

**FIRST CLAIM FOR RELIEF**

**Declaratory Judgment**

34. The allegations contained in the paragraphs above and below are incorporated herein by reference.

35. An actual controversy exists concerning the rights and legal relations of CPP with respect to GET. CPP, therefore, seeks a judgment pursuant to 28 U.S.C. § 2201 declaring the following:

   a. The Master Supply Agreements are valid and binding agreements and, to the

extent that the terms of these agreements conflict with any T&Cs, the Master Supply Agreements control;

b. The warranties identified under ¶ 7.2 of the Master Supply Agreements are exclusive, namely:

   i. A warranty that "at the time of delivery, Products supplied to GE will conform to the applicable written specifications, drawings or designs supplied by GE and accepted by ESCO (within the tolerances designated in writing by GE, or if not designated, then as reasonably determined by ESCO)"; and

   ii. A warranty that the products "will be free from defects in material and workmanship for a period of one year from the date of delivery";

c. The warranties identified in the T&Cs do not apply to the blades supplied by CPP/ESCO;

d. CPP properly waived, and cannot be liable under, any warranty of merchantability or fitness for a particular purpose;

e. No turbochargers supplied by CPP/ESCO were defective or non-conforming;

f. CPP/ESCO did not breach any warranty;

g. Any defect or nonconformity in the turbochargers was caused by Benchmark, not ESCO/CPP and CPP is not liable for the acts or omissions of Benchmark;

h. If CPP/ESCO breached any warranty, CPP's total liability is limited to $5,000 per event or in the aggregate $25,000 in a calendar year;

i. CPP is not liable for any indirect, special, incidental, contingent, or consequential damages, including lost profits or lost savings unless GE incurs such liability with

   its consumers and such liability results directly from CPP/ESCO's failure to perform an obligation under the Master Supply Agreements;

    i. GE has incurred no liability to a consumer;

    ii. Any such liability incurred by GE to a consumer was not the direct result of CPP/ESCO's failure to perform an obligation under the Master Supply Agreement;

  j. CPP/ESCO's liability for any consequential damages, if any, is capped at the lesser of $750,000 or 16% of the total invoice value of products in the calendar year in which the liability is incurred;

  k. GET waived any complaint concerning nonconforming or defective turbocharger blades by failing to timely notify CPP/ESCO of the alleged nonconformity or defect; and

  l. Any claims that the blades supplied by CPP/ESCO are barred by laches or the applicable statute of limitations.

### SECOND CLAIM FOR RELIEF

#### Breach of Contract

  36. The allegations contained in the paragraphs above and below are incorporated herein by reference.

  37. GET breached paragraph 7.4 of the 2012 MSA and 2006 MSA in that it failed to promptly reject allegedly non-conforming blades.  By failing to do so, GET caused CPP to continue to manufacture the blades in the manner GET now claims was non-conforming.  CPP thus wasted resources and has been damaged by having to investigate these claims.

  38. GET breached paragraph 8.2 of the 2012 MSA and 2006 MSA in that GET has

failed and refused to indemnify and hold harmless CCP/ESCO from and against any and all claims and damages related to allegedly non-conforming or defective turbo charger blades.

39.     GET breached paragraph 17 of the 2012 MSA and 2006 MSA in that it filed an Arbitration demand in Ohio - a demand even its lawyers of record knew was improper - rather than "irrevocably consent(ing) to jurisdiction and venue in the courts of the State of New York."

40.     These multiple breaches have harmed and damaged CPP and subjected CPP to needless and continuing costs, fees and expenses.  Moreover, these breaches have caused CPP to incur legal fees and expenses to which they are entitled to recover under paragraph 17 of the agreements.

### THIRD CLAIM FOR RELIEF

#### Stay and Injunction of Arbitration

41.     The allegations contained in the paragraphs above and below are incorporated herein by reference.

42.     The arbitration provision relied on by GET in the T&C is not binding.  As GET's own attorney recognized, the terms of the Master Supply Agreements prevail over any inconsistent terms in the T&Cs, and the Master Supply Agreements specifically provide that all disputes should be resolved in the courts in the State of New York.  The Court should, therefore, stay the arbitration proceeding initiated by GET and enjoin further action in that proceeding.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

43.     On the First Claim for Relief, a judgment declaration of rights and legal relations as identified above;

44.     On the Second Claim for Relief, a judgment for money damages caused by GE's breach of the Master Supply Agreements;

45. On the Third Claim for Relief, an order staying and enjoining the arbitration proceedings initiated by GE in the AAA; and

46. All other and further relief which the Court deems just and proper.

Dated: New York, New York
November 5, 2015

        FARRELL FRITZ, P.C.

        By: *s/ Peter A. Mahler*
           Peter A. Mahler
           370 Lexington Avenue, Suite 800
           New York, New York 10017
           (212) 687-1230

        - and -

        ROSE•WALKER, LLP
           Martin E. Rose
           3500 Maple Avenue, Suite 1200
           Dallas, Texas 75219
           (214) 752-8600

        ***Attorneys for Plaintiff***

Interwoven\5136085.1